## CADIEUX *v.* CADIEUX.

1. DIVORCE—EXTREME CRUELTY—CONDONATION.

Evidence of a conflicting nature in a suit for divorce based on charges of extreme cruelty, *held*, insufficient to justify a decree, and, if credible, the acts charged were condoned by complainant.

2. SAME—GAMBLING—NONSUPPORT.

Although there was testimony in support of the wife's averments and claim that defendant gambled on horses and bought stocks and failed to provide for her maintenance and comfort as fully as her needs required, the proofs were not sufficient to warrant the court in finding that, being of sufficient ability, defendant grossly or wantonly and cruelly refused and neglected to provide suitable maintenance for his wife.

Appeal from Wayne; Hosmer, J. Submitted January 13, 1914. (Docket No. 68.) Decided March 28, 1914.

Bill by Emlita Cadieux against Henry W. Cadieux for divorce. From a decree for defendant, complainant appeals. Affirmed.

*Ralph B. Wilkinson,* for complainant.

*Devine & Snyder,* for defendant.

STEERE, J. This suit was instituted in the circuit court of Wayne county by complainant to obtain from defendant a decree of divorce on the ground of extreme cruelty and failure to support.

The charges in complainant's bill range through the whole period of the married life of the parties, beginning with their wedding trip, and include failure to suitably provide maintenance, irritability, and abusive language, gambling habits, use of drugs, and

cruelty of a private nature. Defendant's answer denied all complainant's charges positively and in detail, otherwise casting no reflections on her nor making any counter charges, and opposed a severance of their marriage ties on the ground that the allegations against him were untrue in fact, and their married life had been a source of happiness to both, congenial and pleasant, except when occasionally disturbed by outside influences. The testimony indicates that he attributed his wife's application for a divorce to the influence of her parents, rather than to her own inclination.

The parties were married in 1901, in Detroit, Mich., where she resided with her parents, who were apparently in good circumstances, living in their own home, which her father, who was engaged in the lumber business, testifies would rent for $75 per month. Defendant was a physician living and practicing at Grosse Pointe where his parents resided. When married he was 30 and she 21 years of age. She states he represented that he then had a practice yielding from $2,500 to $5,000 per year. He states that it was worth $5,000 per year when they were married, and he located in Detroit at the solicitation of his wife and her parents. This she denies, claiming he was anxious to establish himself in Detroit. They were acquainted for nearly a year and a half before their marriage and he had been entertained at her parents' home. Her affiliations were Protestant, while he was of the Catholic faith. It is not shown that this was directly the cause of any friction between them, but she testified that her mother was opposed to Catholic priests and wanted her to be married by a Protestant minister, to which defendant consented. In the year 1902 one child, a daughter, now living, was born as the issue of this marriage, for whom both manifest strong affection. The parties went on a wedding trip

immediately after their marriage and visited the Pan-American Exposition at Buffalo. She claims, and he denies, that their trip was to have been extended to New York, but they were obliged to return owing to his being short of funds. The conflict in their testimony begins at this early stage and continues on through the history of their married life. On their return they went to live with her parents, which she states had been previously agreed upon. Most of their married life together was with her parents. She testifies:

"The arrangement was that father should supply the home, which was a new, solid stone ten-room house with hardwood floors and other conveniences and the furnishing of it, and the doctor was to give mother her board and father, who was a traveling man, his board at such times as he was home."

The extent to which defendant kept his part of the agreement is a matter in dispute.

Defendant opened an office and engaged in the practice of his profession. The testimony is clear to the effect that he acquired a good practice and they apparently were prosperous and living happily. They remained at her parents' home until February, 1906, when defendant left for a time; she remaining. In September, 1906, they went to keeping house in apartments on Jefferson avenue, where they resided for two years and four months, near the end of which time her parents boarded with them for quite a period while their house was being repaired, when they all returned together and occupied her parents' house as before. Defendant claims to have objected to giving up their own home, where they had lived so pleasantly and happily by themselves, but that she and her parents insisted, and he yielded. She testified that he complained of the expense of maintaining a separate home and was anxious to return. They there-

after resided with her parents until shortly before this bill was filed, when she told him that she proposed to get a divorce, and dismissed him. Being asked when it dawned on her that she ought to have a divorce, she replied:

"Well, I can answer you the same as I did Dr. Cadieux. I answered him by saying that it had been a gradual losing of respect covering a period of ten years, and made harder and harder with the passing of each year by his disagreeableness and his low tastes —that he knew best how."

Defendant testified of his dismissal that he knew nothing about any trouble until the morning they separated, when she came to his room and greeted him; on his asking her to kiss him, she refused, saying she would tell him after breakfast; that they breakfasted as usual, and, it being Monday morning, at which time he usually gave her money to run the house, he offered her his share, which was $15, and she said she would receive no more money from him, that her father and mother were going to live in California and she had told them everything about him, that she would not live with a gambler, and they had promised to take her back home and she was going; that his efforts to dissuade her were of no avail, and she soon began this suit.

The testimony of significance in support of complainant's contention, aside from her own, is that of her parents, mostly her mother's, tending to show failure to support his wife and contribute to the maintenance of the establishment to the extent he should and had agreed to, and irritating and unseemly conduct around the home. Complainant's mother, who testified at length of many details in their domestic life, condenses her objections to her son-in-law into "two strong points," being: "No funds and irritability—two pretty hard things to live with." The father, who was from home most of the time, testified

in harmony with his wife to the extent of his observations and experience, and says the doctor "was all self," admits borrowing $200 of him, which was paid back, and says:

"I liked Dr. Cadieux pretty well. I always tried to get along with him. * * * He used to help me fix the furnace and clean off the sidewalk and things like that. * * * The doctor always got along with Mrs. King (complainant's mother), so far as I know."

The only other members of the household with personal knowledge of their daily, domestic life were Harriet Traut, who was a domestic in the family for a year after complainant and defendant went there, and Jennie S. Keeler, a friend who had known Mr. and Mrs. King 35 years and lived in the family, while complainant and defendant were there, for about six years. Harriet Traut stated she thought the doctor and his wife were—

"The best of friends. Mrs. King treated the doctor very nagging; she was very disagreeable in that way. She would find fault with different things with the doctor, trying to pick at him. She was very disagreeable to get along with anyways."

Mrs. Keeler testifies:

"Well, it is a mystery to me. I was in that home the first five years of the doctor's married life. I was in Mrs. King's home the first five years after the marriage of the doctor and Miss King, and it seems to me that I was either blind or deaf or something. I don't know what it is. And so much has been told here that I know nothing about and it is just as new to me as it is to a stranger; I cannot understand it. * * * I don't understand all these things. There are some things I may have known, but they have gone from me. * * * I have always thought that if the doctor and his wife were left alone they could get along well together."

Witness also testified to complainant visiting her

and their talking the matter over, in which conversation witness tried to prevail upon complainant to give up the idea of a divorce for the sake of their child, and said, "If you two don't get along well, why don't you separate and live apart for a while, perhaps it will be all right in the end?" To which complainant replied, "No, I want a divorce from that man," she says, "I might some time want to get married again."

Numerous witnesses of respectability, in responsible positions in life, and their wives, who were or had been friends, neighbors, and associates of both parties to this suit, none of whom speak unkindly of complainant, testify to the good character, habits, and professional standing of defendant and the conduct of these parties towards each other in their daily life and at social gatherings, when mingling with their friends and acquaintances. They speak of them as an "ideal couple," apparently fond of each other and happy together. They moved in good society and were frequently out together at social functions and public entertainments. Between November, 1910, and February, 1911, the month this bill was filed, they attended seven dances, or balls, which were leading, high-class, public, social entertainments, going in taxicabs to six of them, and visited otherwise socially amongst their friends as usual, attending a party together at the home of mutual friends about two weeks before this bill was filed.

While it may be conceded that complainant would conceal so far as possible her private family troubles, it is somewhat significant, as bearing on the charge of nonsupport at least, that there was no suspicion amongst their intimate friends of any estrangement. It is undisputed her husband did provide her with money and credit; the only dispute is as to the amount. She testifies, "I had credit at Hudson's, at Newcomb's, at Elliott-Taylor-Wolfenden's, at Traver-Bird's," lead-

ing merchants of Detroit. Her testimony that defendant was a cocaine fiend is, in our opinion, unsupported and clearly refuted not only by his positive denial, but by all extraneous evidence given by professional men of high standing, his patients, and others. This, with her tendency to magnify comparatively small incidents of their married life, which, if of any importance, had been condoned years before, tends to weaken her uncorroborated testimony as to other more serious charges. As to the charge she makes against defendant of unnatural, secret misconduct, we do not differ with the following conclusion of the learned trial judge:

"If with reference to the other matter of cruelty which is perhaps the highest charge that has been made here, if it were true, I think that Mrs. Cadieux has condoned that by not leaving the doctor at the time; but, as I said before, I am not willing to believe in the truth of that statement."

There is some foundation in the charge that defendant was a gambler. While culpable and an evidence of moral instability, we are not prepared to hold that, as proven, it amounted to a cause of divorce. He was in no sense a professional gambler, nor even a second-class amateur, but is shown to have at times manifested a weakness for attending horse races and investing disastrously in his judgment as to the comparative speed of the competing horses. If his defense depended upon his denials and explanations in that connection, there would be little hope for him. He is also shown to have sought to increase his financial resources by investment in stocks through the brokerage firm of Cameron Currie & Co., which failed disastrously, and he stated at the time that he had lost everything. While this venture is to be deprecated as evidence of a gambling inclination and poor judgment, the courts have not yet gone so far as to hold such conduct ground for divorce. While

at times shown to have been in debt and with impaired credit, defendant is shown at other times to have deposits in bank as high as $1,600 and to have spent money liberally for their pleasure when traveling with complainant. Though culpable at times in foolishly squandering money which should have been expended for the comfort and pleasure of his family, the evidence taken as a whole falls short of establishing that defendant, being of sufficient ability to provide a suitable maintenance for his wife, grossly or wantonly and cruelly refused or neglected so to do.

No useful purpose can be served in further discussing the extremely conflicting testimony of this lengthy record. We have carefully read it, and, while taken as a whole it leaves the impression that defendant has been a disappointment to complainant and her parents, and has failed to do for his wife, and himself, all that other men under like circumstances would have done, we do not find, under the well-settled rules of preponderance and presumption of evidence, that the grounds of divorce charged in the bill of complaint are satisfactorily established. This conclusion was reached by the learned chancellor who heard the evidence develop and had the benefit of observing the witnesses while they testified, and we find no good reason to disturb the result reached by him.

The decree is affirmed but, under the circumstances, we conclude that it should be without costs to either party.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.