CUNNINGHAM *v.* CUNNINGHAM.

DIVORCE — EXTREME CRUELTY — GAMBLING — MARRIAGE — HUSBAND AND WIFE.

Extreme cruelty is not established by a showing that defendant husband, a man of over 70 years of age, was untidy and accustomed to spit on the stove and to drop ashes and burned matches about the house, also that he played cards and gambled in a small way and frequented a resort or place which had once been a saloon and played cards there.

Appeal from Hillsdale; Chester, J. Submitted April 20, 1915. (Docket No. 40.) Decided June 14, 1915.

Bill by Esther Cunningham against Isaiah Cunningham for divorce. From a decree for complainant, defendant appeals. Reversed.

*Merton Fitzpatrick,* for appellant.

*F. A. Lyon,* for appellee.

KUHN, J. The defendant appeals from a decree granting complainant a divorce on the ground of extreme cruelty, and an allowance of $2,000 as permanent alimony.

The parties were married in 1892, in Pennsylvania, and at the time of their marriage the complainant was 23 years of age and the defendant 48. Shortly thereafter they moved to the State of North Dakota, where they lived on a farm until 1900. In that year they sold the Dakota farm and came to Michigan to live, purchasing a farm in the township of Allen in Hillsdale county, where they lived until 1903. In that year they moved to the city of Hillsdale, where they continued to reside until the time of their separation, December 22, 1913. While they were living in Dakota their only child, a daughter, was born, who is now living and is 18 years of age.

On coming to the city of Hillsdale, the defendant engaged in the coal business, and during a portion of the time he also carried on a grocery and feed business in connection therewith. The home which they occupied was in close proximity to the railroad tracks and coal yards. It appears that at the time this property was purchased, the matter of going into the business was discussed between them, and that the deed to the property was taken in their joint names.

The allegations in the bill of complaint as originally filed consist largely of complaints of the personal hab-

its and manners of the defendant and of his conduct in and about the house. Simply as evidence of the character of these complaints, the following is taken from the testimony of the complainant:

"It was muddy and coal black and dirty around the place, and he would come in and walk through the store and into the kitchen and through the sitting room quite frequently; he would go through the whole house at times. He was quite a hand to smoke and knock ashes out on the stove, and to sit around in front of the stove and knock them out and light his pipe and snip the matches around. I told him I thought it was just as easy for him to empty his pipe into the stove as it was to empty it out onto the stove and the floor. He didn't say anything, but sometimes he'd say, 'Babe can sweep them up.' He meant our daughter Lorena. I worked all I possibly could. He told me I didn't do anything, and I wasn't interested in anything, and that I always throwed the coal business aside for my washing."

And the following from the testimony of the daughter:

"Our home was right along by the railroad track. There was a house between our house and the road. Our house was on the back end of the lot. Mrs. Osborn and her daughter, Mrs. Perry, lived on the front end of the lot. Mr. Eldridge lives the first house west of Mrs. Osborn. There were no other houses on the back end of the lot. The Hillsdale Grocery Company's warehouse was directly east of our house. The coal bins were between our house and Mrs. Perry's. They were right by our house. We kept the groceries in the office. They would drive in to get coal between Mrs. Perry's and Mrs. Eldridge's, and they would drive in around to the grocery company's warehouse. They would have to drive in from the street. My mother did the housework and had no help except myself. There were four rooms below and only one carpeted. Mother had to mop all the other floors. It was real muddy down there when it rained. Father would track in mud; it would stick to his feet and he wouldn't try to get it off. This would happen every

day when it was muddy. It would dirty up the floor. I have heard mother ask him not to come in without cleaning his feet. He said that he would just as soon live in it. Father was always smoking and when he would empty his pipe he would empty it on the stove, on the outside of the stove, or else on the floor. I have heard mother speak to him about that. I don't remember what he would say. I have seen him blow his nose on the floor to dirty it. He did not chew tobacco very much; did once in awhile. He would sometimes spit on the stove. It would sometimes go in and sometimes beyond the side. My mother's conduct toward him was kind. During the past year his conduct toward her wasn't very kind. She couldn't do anything to please him, and he would find fault with everything she did. I heard him swear at her once."

Complaint is also made as to his lack of personal cleanliness, but it would profit no one to attempt to repeat the many seemingly trivial complaints which are set up in the record and discussed in the briefs· of counsel.

After the case had been heard, an amendment was permitted to the bill of complaint to show misconduct on the part of the defendant because of his having visited frequently a resort known as "Boyd's Place," which it seems was at one time a saloon, and later a place where men congregated to play cards. It is complainant's claim, and she so testified, that knowledge of this habit of visiting Boyd's Place, because of its bad reputation, brought great shame, humiliation, and disgrace to her and her family.

There is unquestionably ground for the complaint that the defendant was inclined to enjoy a game of cards, which he indulged in even when small amounts of money were at stake, and this he frankly admits in his testimony. It is true that his conduct in frequenting the place where he indulged in this practice and the pleasure that he seemed to get from gambling in a small way, could be the subject of some criticism, but, as was said by this court in *Cadieux* v. *Cadieux*,

180 Mich. 99, at page 105 (146 N. W. 161, at page 163):

"While culpable and an evidence of moral instability, we are not prepared to hold that, as proven, it amounted to a cause of divorce."

We have carefully read this record, and although having in mind the fact that the learned chancellor, who heard the case below, had the advantage of seeing and hearing the witnesses, nevertheless we cannot escape the conclusion, taking the record as a whole and carefully weighing the testimony, that no just and legal cause for a divorce has been proved. These parties had resided together as man and wife for a period of 20 years, and it does not appear that any remarkable change has come about in the personal conduct and habits of the defendant from the time of his marriage. The record is convincing that both of the parties have been industrious and apparently willing to meet the everyday problems of life in the proper spirit, and considering their station in life and the surroundings in which the defendant toiled to fulfill his duties as a provider for his family, assisted by the complainant, it does not seem just and equitable that now, when the defendant has reached the age of 70 years, because of grievances of a character which might easily be found in the married life of many people in such a period of time, he should be deprived of the association and comfort of his wife and only child, both of whom he still insists he loves and wishes to have with him. As this court said in *Root* v. *Root*, 164 Mich. 638, 644 (130 N. W. 194, 32 L. R. A. [N. S.] 837, Am. & Eng. Ann. Cas. 1912B, 740):

"Neither incompatibility of temper nor the ordinary misunderstandings and bickerings which are characteristic of the marriage relation in a considerable percentage of cases, have been made grounds for divorce in this State. The legislature might, if it chose, ex-

tend the jurisdiction of courts to grant decrees of divorce upon these grounds. It has not done so, however, and those who are married must bear the real or fancied burdens they have assumed, unless the conduct of one entitles the other, that other being without fault, to a severance of the relation for one or other of the statutory causes."

We are of the opinion that in this case the proofs are not satisfactory to make out a case of extreme cruelty under the statute, and that the decree must be reversed and the bill dismissed, without costs to either party.

BROOKE, C. J., and McALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE JJ., concurred.